229 So.2d 841 (1969)
C. Vernon MIZE, Jr., Appellant,
v.
COUNTY OF SEMINOLE, Florida, et al., Appellees.
Robert F. TUCKER, et al., Appellants,
v.
COUNTY OF SEMINOLE, Florida, et al., Appellees.
Robert F. TUCKER, et al., Appellants,
v.
COUNTY OF SEMINOLE, Florida, et al., Appellees.
SEMINOLE COUNTY, et al., Petitioners,
v.
Robert F. TUCKER, William T. Pratt, Jr., and James F. Latner, Respondents.
Nos. 38014, 38200, 38201 and 38040.
Supreme Court of Florida.
September 24, 1969.
Rehearing Denied October 17, 1969.
*842 Mack N. Cleveland, Jr., of Cleveland & Mize, Sanford, for C. Vernon Mize.
Harlan Tuck of Giles, Hedrick & Robinson, Orlando, for James F. Latner, Robert F. Tucker, and William T. Pratt, Jr.
W.C. Hutchison, Jr., of Hutchison & Leffler, and Harold F. Johnson, Orlando, for County of Seminole.
Abbott M. Herring, State's Atty., and Thomas A. Speer, Asst. State's Atty., for State of Florida.
DREW and ADKINS, Justices.
The pivotal point in each of the above cases is whether Sanford is the permanent county seat of Seminole County. They have been consolidated, orally argued, and will be disposed of in one opinion. The background and history of this involved litigation follows.
No. 38,014 is an appeal from a final judgment validating $2,900,000 of bonds of Seminole County proposed to be issued for the purpose of providing funds for building a courthouse and jail in the City of Sanford. The final decree was rendered September 12, 1968. The Notice of Appeal from the judgment validating these bonds was filed October 3, 1968.
No. 38,200 is an appeal from a post judgment order arising out of the validation proceeding (No. 38,014). After entry of the September 12, 1968, validation judgment by the Circuit Court, the District Court of Appeal, 4th District, rendered its decision reversing a final judgment of the same Circuit Court, which judgment had dismissed a complaint to enjoin construction of a jail and courthouse in Sanford and had declared Sanford to be the permanent county seat. The successful parties in the litigation in the District Court moved for relief under Rule 1.540(b) (5), Florida Rules of Civil Procedure, 31 F.S.A.,[1] from the final judgment validating the bonds. Upon hearing, such motion was denied and this appeal is from that order.
No. 38,201 is an appeal from a post judgment order in the validation proceedings denying a motion to strike certain portions of the record in the declaratory judgment proceedings (No. 38,040, infra) from the record in the validation proceedings.
No. 38,040 is a petition for certiorari which was filed in this Court November 20, 1968, seeking a review of the decision of the District Court of Appeal, 4th District, dated September 26, 1968, which reversed the final judgment of the Circuit Court of Seminole County dated October 4, 1967, in the declaratory judgment proceedings, supra, declaring that the City of Sanford was the permanent county seat of *843 Seminole County subject to change only as provided by general law.
As will be noted, the proceeding in Seminole County for declaratory decree and the validation proceedings were taking place at about the same time. The declaratory judgment proceeding had been concluded in the trial court by the final decree of October 4, 1967, and was, pursuant to a timely appeal, under consideration by the District Court of Appeal, 4th District, at the time the petition to validate was filed on August 13, 1968. The decision of the District Court of Appeal involved in No. 38,040, of September 26, 1968, rendered after the validation judgment, if allowed to stand, would squarely conflict with the final judgment of the Circuit Court of Seminole County validating the bonds.

JURISDICTION
There is no question concerning the jurisdiction of this Court in the bond validation proceedings in No. 38,014,[2] nor is there any question of our jurisdiction in No. 38,200 or 38,201, which arise out of the validation proceedings.
A more serious question arises in con nection with the jurisdiction of this Court in No. 38,040, the declaratory judgment action. Jurisdiction is alleged to be vested in this Court in the Petition for Certiorari for the reason that said decision "affects a class of constitutional officers, to-wit, county commissioners, as demonstrated by the decision which enjoins petitioners from financing the construction of a courthouse in the City of Sanford under the provisions of Chapter 135, Florida Statutes, 1967 [F.S.A.]." We accept jurisdiction in this proceeding not because of the reasons assigned above in the Petition for Certiorari, but by virtue of the provisions of the constitution authorizing this Court to issue all writs necessary or proper to the complete exercise of its jurisdiction.[3]
This Court, being vested with exclusive jurisdiction in all proceedings for the validation of bonds and certificates of indebtedness, would be completely frustrated in the necessary and proper exercise of that jurisdiction in the validation proceedings unless it could bring before it for review the decision of the District Court which enjoined the issuance of said bonds. Ultimate disposition of this case, therefore, is not only necessary and proper but essential to the complete exercise of our jurisdiction. We therefore accept jurisdiction in No. 38,040.

ON THE MERITS

The Certiorari Proceedings
We shall first discuss the declaratory judgment action, No. 38,040. The decision of the District Court[4] in this case reversed a final judgment of the Circuit Judge of Seminole County and remanded the same with directions that judgment be entered enjoining the Board of County Commissioners of said county from financing the construction of a courthouse in the City of Sanford under the provisions of Chapter 135, Florida Statutes, 1967, F.S.A. The decision held that Sanford was not the permanent seat of county government of Seminole County, but continued to be the temporary seat of government and, therefore, the County was precluded from proceeding with the construction of the courthouse and jail under Chapter 135, Florida *844 Statutes, 1967, F.S.A., supra. Such decision reached a conclusion directly opposed to that of the trial judge. We have concluded that the final judgment reversed by the decision aforesaid was correct. Because it fully sets forth the history and background of this controversy and the reasons for the conclusions there reached with which we are in agreement, we quote the pertinent portions thereof at length:
"This suit was filed praying for the issuance of an injunction against Seminole County and against the County Commissioners of Seminole County prohibiting them from constructing a new County courthouse and jail addition in the City of Sanford at a site adjacent to the old existing courthouse, and also asking that the Court enjoin the Defendants from unlawfully expending County funds and from `the unlawful levy of taxes' for such purposes. The Plaintiffs are taxpayers who reside in the southerly half of the County, the City of Sanford being situated at the northern margins of the County on the shores of Lake Monroe. The Plaintiffs ground their suit upon two bases: first, that the City of Sanford has never been declared legally to be the `permanent' County seat of Seminole County; and, second, that the County Commissioners of Seminole County have not complied with the provisions of Section 135.01, Florida Statutes [F.S.A.], providing for a public hearing upon thirty (30) days published notice, and also for a determination of necessity. The City of Sanford has intervened seeking a determination by declaratory judgment that the City of Sanford is in fact the permanent seat of county government in Seminole County.
"Most of the facts have been admitted in the pleadings and by way of pre-trial stipulation. Trial was held before the Court on August 31, 1967, and the Court has taken the matter under consideration since that time, being aided by the excellent arguments and briefs of counsel for the parties.
"Seminole County was created in 1913 by Chapter 6511, Laws of Florida, 1913. By Section 3 thereof it was provided: `Sec. 3. The City of Sanford shall be the temporary County Seat of said County until a permanent County Seat is duly established in accordance with the laws of this State.' Nothing has been done since 1913 to establish a permanent county seat for Seminole County, but instead the City of Sanford has continued to serve as county seat over a period of 54 years to the present time. In the meantime the Legislature has acted in other ways. In 1919 by special act, Chapter 8197, Laws 1919, it authorized the expenditure of public funds, to be raised by issuance of time warrants, for the purchase and construction of a county courthouse. Again in 1925, by Chapter 11190, Laws 1925, it authorized expenditure of public funds for constructing a county jail, the funds to be raised by issuance of time warrants and the indebtedness to be amortized by taxation in subsequent years. No issue appears ever to have been made through these years as to the location of the seat of county government. The courthouse was acquired in the City of Sanford and the county jail was erected in Sanford. In the year 1959 the Board of County Commissioners, acting under the provisions of Chapter 135, Florida Statutes [F.S.A.] determined at a public hearing after published notice that there was a need and necessity in Seminole County for the construction of additions to the existing courthouse and construction of a new jail. In August, 1960, a formal resolution was adopted authorizing issuance of certificate of indebtedness up to $500,000 for the construction. This was validated by a Final Decree in the Circuit Court in September of 1966. Pursuant to the authority thereby established the County of Seminole erected a new and modern county jail facility and also accomplished substantial repairs and renovations to what was then an old courthouse building.
"The County government has continued to function at this location, and for the most *845 part, in this old original courthouse building. There is no issue or dispute in this litigation over the fact that the present courthouse in Seminole County is inadequate, aged, obsolete and unable to serve the needs of the County.
"With this background stated, we look first to the question of the status of the City of Sanford. The Constitution provides in Article 8, Section 4, that the legislature shall have no power to remove the county seat of any county, but shall provide by general law for such removal. It then follows, by a proviso, that in the formation of new counties the county seat may be temporarily established by law. This procedure was followed in 1913 when the Legislature established the county of Seminole, and the City of Sanford was designated as the temporary county seat, since to go further than this was beyond the power of the Legislature. From then on any action with respect to the location of the county seat became a matter of removal under the provisions of general law, being the provisions now appearing in Chapter 138, Florida Statutes [F.S.A.]. The provision of general law places the decision as to location of a county seat in the qualified voters of the County. Seminole County, since the year of its formation has never acted under any provision of general or special law for the relocation of its county seat, and in fact has on numerous occasions ratified and reconfirmed the recognition of its seat of government in the City of Sanford. The Court finds that the people of Seminole County have acquiesced in and have continued the temporary county seat as the permanent one. Applying the language of the Florida Supreme Court in the case of Martin County v. Hansen, 111 Fla. 40, 149 So. 616, the Court holds now that the City of Sanford is the permanent county seat of Seminole County and is subject to change or removal only through the procedures authorized in Chapter 138, Florida Statutes [F.S.A.].
"We pass now to the second question, whether the County Commissioners should be enjoined from constructing a new courthouse and jail addition because they have not yet complied with the provisions of Chapter 135, Florida Statutes [F.S.A.].
"It is clear from the evidence that no notice has been published and no hearing held in compliance with the provisions of Florida Statutes, Section 135.01 [F.S.A.]. The Board of County Commissioners has not yet determined by a majority of its members that `it is necessary' to erect and build a new courthouse and jail addition. It is apparent from the facts that the County Commissioners are exploring facts and gathering data. They are consulting with an architect, and the record indicates that an architect has been retained, however, it does not appear that work has been done beyond the most preliminary planning phase. Such data, information, expert advise [sic] and opinion, sketches and other material collected by the County Commissioners would all be a logical forerunner of the decision to proceed or not to proceed. Certainly, a decision based upon the fullest possible investigation is to be commended. No construction contract has been let. The Court cannot say that all of such actions are not fully consistent with an effort to assemble the most complete information prior to and as a basis for the ultimate decision. It would be inappropriate to enjoin the County from doing something clearly within its power until it complied with admitted requirements of law. To do so would be a vain and useless exercise of equitable writ. We hold, therefore, that the request for injunctive relief is prematurely made.
"Parenthetically, it is stated that no consideration has been given in this decision to the economic, social or political wisdom of the location of the county seat, since that is a matter of debate in the legislative rather than the judicial forum. Thus it is that all allegations of the pleadings have been stricken which would have sought to establish such issues in this case.
*846 "In consideration of the premises, and of the findings herein above set forth, it is thereupon
"ORDERED AND ADJUDGED that the relief prayed in the Amended Complaint be and the same is hereby denied, and the said Amended Complaint is hereby dismissed; and it is
"FURTHER ORDERED AND ADJUDGED that the prayer for declaratory relief contained in the Counterclaim be and the same is hereby granted, and the Court declares and determines that the City of Sanford is the permanent county seat of Seminole County, subject to change only as provided by general law."
In Martin County v. Hansen, 111 Fla. 40, 45, 149 So. 616, 618 (1933), cited by the able trial judge, this Court on rehearing said:
The temporary county site under the act creating the county was fixed for five years at Stuart, and, while the law authorizes election to determine the permanent county site, it is not mandatory that such an election be held, and, though we express no opinion as to this, we know of no reason that would preclude the people of a county from acquiescing in and continuing the temporary county site as the permanent one under the facts here shown.
Admittedly, this language is dicta in that case. We agree, however, with what was there said and adopt that language as the controlling principle in this case. After more than 50 years, during which Seminole County has functioned with Sanford as the county seat, it is now too late to question the permanent nature of the seat of county government. Infinitely more mischief and harm would result to the public from now declaring such location to be temporary than would result from approving the location as permanent, a status which has existed for more than half a century, with the obvious acquiescence of the citizens affected.
Certiorari is granted in No. 38,040, the decision of the District Court is quashed with directions to affirm the final judgment in said cause dated October 4, 1967.

The Bond Validation
In view of the ultimate disposition of the bond validation proceedings, we find it unnecessary to discuss the appeals in Nos. 38,200 and 38,201. The orders appealed from in both instances are found to be without error and are affirmed.
In the validation proceedings in No. 38,014, it is conceded by the parties that the bonds validated by the final judgment of validation of September 12, 1968, have not to this date been issued and sold. In the meantime, a new Constitution has been adopted by the people of Florida, the same having been made effective January 7, 1969.[5] Three sections of the new Constitution are concerned with the protection of the rights of purchasers of bonds and revenue certificates under Fla. Const. 1885,[6] viz. Sections 7 and 8 of Article XII and Section 12 of Article VII.[7] Since the bonds validated *847 had not been sold at the time the new Constitution became effective, there existed no actions, rights of action, claims upon the bonds, contracts of individuals or obligations of public bodies to survive as provided in Section 7 of Article XII, supra. It is obvious that Section 7 of Article XII, supra, does not by intendment or otherwise vitalize the unsold bonds involved in these proceedings. Nor can it be said that under Section 8 of Article XII, supra, the bonds here involved are public debts, not having been "issued" in the legal sense prior to the date the Constitution became effective.
In 1930, the City of Jacksonville had issued and validated certain municipal bonds prior to the effective date of Article IX, Section 6, of the Constitution of 1885, which required freeholder approval in all such cases. Some of the bonds had been sold prior to the amendment and some remained unsold. A suit was brought to enjoin the city from selling the bonds which remained unsold after the passage of the amendment. The complaint in that case alleged: "All of said bonds were authorized and validated prior to the adoption of the constitutional amendment and therefore were not affected thereby." In upholding the action of the trial court in enjoining the sale of the remaining bonds, this Court said:[8]
This section of the Constitution divests counties, districts and municipalities of any authority which either may have theretofore enjoyed to issue bonds except upon the compliance with the provisions of this section. Bonds such as those here under consideration are negotiable instruments and are controlled by what is generally known as the negotiable instrument statute of this state, section 4674 Rev. Gen.St. 1920, section 6760 Comp.Gen. Laws 1927, which in part provides as follows:
"`Issue' means the first delivery of the instrument, complete in form to a person who takes it as a holder."
Under this definition of "issue" the bonds here under consideration had not been issued. The negotiable instrument statute was in effect at the time the above-quoted amendment to our Constitution was adopted, and we hold that the statutory definition then in force is to be applied to the word "issue" as contained in this provision of the Constitution.
In Potter v. Lainhart, 44 Fla. 647, 33 So. 251, it was held:
"The word `issued,' as applied to bonds, usually includes delivery, but it does not invariably do so."

*848 But, where a different meaning is to be given the word "issue," the intention to give it such different meaning must appear upon the face of the act or document in which it is used. The word "issue" is used in the section of the Constitution above quoted without any other language being used to indicate that any except the general meaning is to be applied to such word.
The bonds under consideration here were authorized, executed, and validated, but before being issued as contemplated by law under the definition given in section 4674 Rev.Gen.St. 1920, section 6760 Comp. Gen.Laws 1927, the organic law was amended in such manner as to bring the issuance of these bonds in conflict with its provisions.
This construction and interpretation was applied in the case of Stewart vs. New Smyrna-Coronado Beach Special Road and Bridge District, etc., 132 So. 636, filed at this term of the court.
The decree appealed from should be affirmed, and it is so ordered.
In the number of cases prior to and since that time, this Court has held that bonds are not "issued" until they have been duly executed and delivered, the obligation of the bond being fixed as of the date of issuance and not necessarily as of the date of the bonds.[9]
The County contends that in two recent decisions of this Court[10] we upheld the validity of certain revenue bonds issued by Brevard County and Central Florida Expressway, which were validated prior to the effective date of the 1968 Constitution while the Decision here was rendered subsequent to January 7, 1969. These bonds had not only been issued and validated but sold and delivered and the proceeds thereof received by the authorities prior to the effective date of the new Constitution. Such decision does not therefore support the contention of the County.
Other provisions of the Fla. Const. 1968 are pertinent in determining whether these bonds, properly validated without a vote of the freeholders prior to the adoption of the Constitution of 1968, may now be sold.
The erection or repair of the courthouse is an essential governmental function. See State v. County of Dade, 92 So.2d 186 (Fla. 1957). Art. VIII, § 1(k), Fla. Const. 1968, recognized this when it provided:
In every county there shall be a county seat at which shall be located the principal offices and permanent records of all county officers. (Emphasis supplied)
Fla. Const. 1885 had no provision requiring the location of "the principal offices" of the county. The county commissioners of Seminole County determined that the principal offices of county government were inadequate and needed replacement. The commissioners were the exclusive ones to determine the time and extent to which replacement and repair were necessary and there is no contention that they abused their discretion. See State v. County of Palm Beach, 89 So.2d 607, 611 (Fla. 1956).
Under the provisions of Fla. Stat., § 135.01, F.S.A., the county commissioners duly determined this necessity and authorized the levy of a building tax not exceeding five mills. Art. XII, § 7(b), Fla. Const. 1968, provides as follows:
This revision shall not be retroactive so as to create any right or liability which did not exist under the Constitution of 1885, as amended, based upon *849 matters occurring prior to the adoption of this revision. (Emphasis supplied)
Prior to the adoption of Fla. Const. 1968, the electorate or freeholders had no right to determine the necessity and feasibility of the erection of the courthouse and remove this determination from the Board of County Commissioners, as funds for the construction of a courthouse could be secured through the validation and issuance of bonds without any vote by the electorate or the freeholders. If we should refuse to authorize the issuance and sale of the bonds because of lack of approval by the electorate or freeholders, the effect of our opinion would be to create a right which did not exist under the Constitution of 1885 and thereby violate the express provision of Fla. Const. 1968 quoted above.
In addition the resolution of the county commissioners authorized a tax millage sufficient to finance the construction of the courthouse, in accordance with the provisions of Fla. Stat., § 135.01, F.S.A. Art. XII, § 2, Fla. Const. 1968, provides as follows:
Tax millages authorized in counties, municipalities and special districts, on the date this revision becomes effective, may be continued until reduced by law.
The above provisions of Fla. Const. 1968 preserved all of the rights and liabilities of the parties as they existed at the time the final judgment of validation was entered, and should not be construed so as to invalidate the efforts of the county commissioners in performing this governmental function.
We do not overrule City of Jacksonville v. Renfroe, supra, but hold that under the provisions of Art. XII, §§ 2 and 7 (b), Fla. Const. 1968, the circumstances of this case are such that these bonds may be issued and sold even though they were validated at a time when the electorate or freeholders did not have the right to vote upon the propriety of the issue.
The judgment validating the bonds is affirmed.
ERVIN, C.J., THORNAL and BOYD, JJ., and SPECTOR, District Court Judge, concur.
CALDWELL (Retired) J., heard argument, but did not participate in opinion.
NOTES
[1] This rule provides, inter alia: "On motion and upon such terms as are just, the court may relieve a party * * * from a final judgment, * * * for the following reasons: * * * (5) * * * a prior judgment or decree upon which it is based has been reversed or otherwise vacated or it is no longer equitable that the judgment or decree should have prospective application."
[2] "Appeals from trial courts may be taken directly to the supreme court, as a matter of right, * * * from final judgments * * * in proceedings for the validation of bonds and certificates of indebtedness." Fla. Const. art. V, § 4(2), F.S.A.
[3] "The supreme court may issue all writs necessary or proper to the complete exercise of its jurisdiction." Fla. Const. art. V, § 4(2). Also see F.A.R. 4.5, subd. g (1), 32 F.S.A.; and Couse v. Canal Authority, 209 So.2d 865 (Fla. 1968).
[4] Tucker v. Seminole County, 214 So.2d 745 (4th Dist.Ct.App.Fla. 1968).
[5] Fla. Const. art. XVII, § 4; Ammerman, et al. v. Markham, Tax Assessor, et al., 222 So.2d 423 (Supreme Court), Opinion filed May 7, 1969; In Re: Advisory Opinion to Governor, 217 So.2d 289 (Fla. 1968).
[6] The question of whether the issuance of these bonds was affected by the adoption of the 1968 Constitution was raised during the oral argument. The respective parties were requested to file briefs on the question. Such briefs have been filed and have been carefully considered by the Court.
[7] Fla. Const. art. XII, § 7 (1968) states:

Rights reserved.  (a) All actions, rights of action, claims, contract and obligations of individuals, corporations and public bodies or agencies existing on the date this revision becomes effective shall continue to be valid as if this revision had not been adopted. All taxes, penalties, fines and forfeitures owing to the state under the Constitution of 1885, as amended, shall inure to the state under this revision, and all sentences as punishment for crime shall be executed according to their terms. (b) This revision shall not be retroactive so as to create any right or liability which did not exist under the Constitution of 1885, as amended, based upon matters occurring prior to the adoption of this revision.
Fla. Const. art. XII, § 8 (1968) states:
Public debts recognized.  All bonds, revenue certificates, revenue bonds and tax anticipation certificates issued pursuant to the Constitution of 1885, as amended by the state, any agency, political subdivision or public corporation of the state shall remain in full force and effect and shall be secured by the same sources of revenue as before the adoption of this revision, and, to the extent necessary to effectuate this section, the applicable provisions of the Constitution of 1885, as amended, are retained as a part of this revision until payment in full of these public securities.
Fla. Const. art. VII, § 12 (1968) states:
Local bonds.  Counties, school districts, municipalities, special districts and local governmental bodies with taxing powers may issue bonds, certificates of indebtedness or any form of tax anticipation certificates, payable from ad valorem taxation and maturing more than twelve months after issuance only: (a) to finance or refinance capital projects authorized by law and only when approved by vote of the electors who are owners of freeholds therein not wholly exempt from taxation; or (b) to refund outstanding bonds and interest and redemption premium thereon at a lower net average interest cost rate.
[8] City of Jacksonville v. Renfroe, 102 Fla. 512, 514-515, 136 So. 254, 256 (1931).
[9] Potter v. Lainhart, 44 Fla. 647, 33 So. 251 (1902); Osborne v. Stripling, 81 Fla. 375, 88 So. 265 (1921); State ex rel. Woman's Catholic Order of Foresters v. City of Ft. Myers, 143 Fla. 304, 196 So. 705 (1940).
[10] Stewart & Canaveral Marine, Inc. v. Florida Development Commission and Stewart v. Florida Development Commission, 220 So.2d 900 (Fla. 1969).